# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 4, 2010

Charles R. Fulbruge III
Clerk

No. 08-10966

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ERNIE BRADFORD SCROGGINS, also known as, Gangsta,

Defendant - Appellant.

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
USDC No. 3:07-CR-258-ALL

Before BENAVIDES, DENNIS, and ELROD, Circuit Judges.[*]

JENNIFER WALKER ELROD, Circuit Judge:

Defendant-Appellant Ernie Bradford Scroggins appeals his conviction for possession of a firearm by a felon, arguing that the government obtained evidence necessary to his conviction in violation of the Fourth Amendment and that his conviction is unconstitutional in light of the Second Amendment. We affirm.

---

[*] James L. Dennis, Circuit Judge, concurs in the judgment only.

No. 08-10966

## I.    FACTS AND PROCEEDINGS

### A.    Facts

The following facts are summarized from the findings of the district court in connection with a suppression ruling and bench trial, with certain points of conflicting testimony noted.

On August 6, 2007, several Deputy United States Marshals ("DUSMs") and other federal law enforcement agents[1] appeared at Scroggins's house to arrest his fiancée, Lashazzel Bell.  An anonymous tip had indicated Bell would be at the house along with a male possibly involved in some murders.  DUSM Fomby, along with other government officers, set up surveillance.  After 10 minutes, they observed Bell on the front porch.  They then approached her and arrested her without incident.  They asked if anyone else was in the house, and she replied that her "husband" was.

DUSM Fomby and other officers subsequently entered the house with Bell.  Bell had asked to re-enter the house to retrieve different clothing, as she considered her attire to be overly revealing.  The officers told her she could not enter the house unless they accompanied her.  Bell's testimony conflicts with that of the officers as to precisely what happened next, but the district court found that Bell consented to the officers entering the house when she entered knowing that they would accompany her.  The officers wore plain clothes, and testimony conflicted as to which if any of them had visible badges and police vests, but the district court found that the officers entering the house were visually identifiable as police.

When the officers entered the house, they immediately encountered Scroggins in the hallway.  They shouted for him to stop, and one officer made eye contact with him.  He then fled into a bedroom and officers heard a loud thump.

---

[1] For ease of reference, we will refer to these deputies and agents collectively as "officers," while noting their individual titles as necessary.

No. 08-10966

Soon thereafter he emerged and the officers ordered him to the floor, handcuffed him, and frisked him.

The frisk, conducted by DUSM Fomby, revealed evidence leading to Scroggins's arrest and conviction. DUSM Fomby removed a semi-automatic pistol magazine from Scroggins's pockets. He asked Scroggins where the weapon was that went with the magazine. Scroggins indicated it was in the bedroom to which he had fled. The officers performed a security sweep of the bedroom and the rest of the house, observing two guns in plain view in the bedroom. DUSM Fomby also found and removed Scroggins's wallet in connection with the frisk, and identified Scroggins from documents in the wallet. After the frisk and security sweep, the officers called in the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Scroggins was detained from this point forward, and ultimately arrested for being a felon in possession.

**B.    Proceedings**

A grand jury indicted Scroggins on two counts of possession of a firearm by a felon under 18 U.S.C. §§ 922(g)(1) and a forfeiture count under 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). Scroggins, represented by the Federal Public Defender, moved to suppress the firearms and other evidence, alleging that his detention and the officers' entry into the home violated the Fourth Amendment's prohibition on unreasonable searches and seizures. The district court held a suppression hearing on October 11, 2007, and in a later written order denied Scroggins's motion. The witnesses at the hearing on the motion to suppress were Bell and DUSM Fomby. The court credited Fomby's testimony in numerous specific regards, and also stated, generally, that "[t]o the extent [Bell's and Fomby's] testimony conflicted, the court credits and accepts the testimony of DUSM Fomby, except as expressly found below."

Scroggins thereafter obtained new, appointed counsel, who by various means attempted to have the suppression motion reheard. Scroggins's new

counsel first moved unsuccessfully for rehearing of the motion to suppress and then, also unsuccessfully, for reconsideration of the denial of the rehearing motion. Scroggins then attempted to stipulate to factual guilt at a bench trial, and thereby qualify for acceptance of responsibility for sentencing purposes under *United States v. Washington*, 340 F.3d 222 (5th Cir. 2003), while reserving the right to appeal the suppression ruling—and using the forum of the bench trial to reargue suppression. The government objected and claimed it no longer stipulated to Scroggins's proposed facts. It argued that, by calling most of the involved individuals as witnesses at the bench trial, and thereby essentially putting the government through the burden of a trial, Scroggins failed to comply with the procedure envisioned by *Washington*. The district court agreed, indicating that if Scroggins proceeded with the trial, he probably would not be entitled to acceptance of responsibility. After conferring with Scroggins, Scroggins's counsel asked to commence trial, in order to "proceed with the questioning regarding the Fourth Amendment issues." Thus the bench trial proceeded with Scroggins calling witnesses on suppression-related issues and the government putting in evidence to support the conviction, with Scroggins repeatedly protesting that the latter was unnecessary because he stipulated to that evidence. Fomby, DUSM Lewandowsky, and Special Agents Thompson, Sewell, and Stephens testified.

At the conclusion of the bench trial, the district court found Scroggins guilty. In its oral ruling announcing the findings of guilt, the district court reaffirmed its findings and legal conclusions from the previous order denying the suppression motion, generally credited the testimony of the officers, and made additional explicit findings. The district court later sentenced Scroggins to 51 months imprisonment and three years supervised release.

No. 08-10966

## II.    DISCUSSION

### A.    Fourth Amendment arguments

As he did in the district court, Scroggins asserts on appeal that DUSM Fomby and the other officers violated the Fourth Amendment by unreasonably entering the house without a warrant, and by exceeding the scope of any permissible investigation when they detained and frisked him and searched the house.  He also, primarily in his reply brief and in subsequent letters filed under Fed. R. App. P. 28(j), presents a further argument that we conclude was not presented in the district court, challenging the seizure and search of his wallet. He argues that in light of these alleged violations, the evidence obtained in the house should be suppressed.

#### 1.    Standard of review

When reviewing a denial of a motion to suppress evidence, we review factual findings for clear error and the ultimate constitutionality of law enforcement action *de novo*.  *United States v. Perez*, 484 F.3d 735, 739 (5th Cir. 2007) (citation omitted).  A finding is clearly erroneous only if the court is left with a definite and firm conviction that a mistake has been committed.  *United States v. Fernandez*, 279 F.3d 302, 306 (5th Cir. 2002).  The clearly erroneous standard is particularly deferential where "denial of the suppression motion is based on live oral testimony . . . because the judge had the opportunity to observe the demeanor of the witnesses."  *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation and internal quotation marks omitted).  In addition to deferring to explicit the district court's factual findings, the court must view the evidence "most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole."  *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993).  The district court's ruling should be upheld "if there is any

5

reasonable view of the evidence to support it." *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999) (citation and internal quotation marks omitted).

## 2.    Fourth Amendment standards

The Fourth Amendment protects against "unreasonable searches and seizures" affecting the security of the people's "persons, houses, papers, and effects." U.S. Const. Am. IV.[2] Warrantless searches and seizures inside a home are "presumptively unreasonable," but "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted).

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In order to satisfy the consent exception, the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority. *United States v. Gonzalez*, 121 F.3d 928, 938 (5th Cir. 1997). Only the first element is at issue in the present case, and it is a question of fact reviewed for clear error. *United States v. Botello*, 991 F.2d 189, 194 (5th Cir. 1993).

When police enter a home based on consent or another lawful basis, and possess a reasonable, articulable suspicion "that the area to be swept harbors an individual posing a danger to those on the scene," they may conduct a protective sweep of the premises. *United States v. Gould*, 364 F.3d 578, 587 (5th Cir. 2004) (en banc) (citation and internal quotation marks omitted). The protective sweep is related in rationale and permissible scope to the "frisk" component of a stop-

---

[2] It reads in full: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

and-frisk under *Terry v. Ohio*, 392 U.S. 1 (1968). *See Gould*, 364 F.3d at 581, 582–83, 584 (discussing the protective sweep doctrine as an outgrowth of *Terry* and subsequent related cases). Under *Terry*, officers may briefly detain an individual on the street for questioning, without probable cause, when they possess reasonable, articulable suspicion of criminal activity. *See generally United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc) (discussing and applying *Terry*). In order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry. *Michelletti*, 13 F.3d at 840. The purpose of the frisk is to afford an officer "the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Accordingly, if the situation warrants it, officers may take further steps in connection with a *Terry* frisk, including handcuffing, as long as they are not "unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000).

Both *Terry* and the protective sweep doctrine of *Gould* depend on a reasonableness inquiry that evolves with new information. Reasonable suspicion inquiries allow officers to consider "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989). If officers gain new information relevant to safety or criminal conduct, the scope of their permissible investigation may expand. For example, reasonable suspicion may "ripen" or "develop" into probable cause for an arrest if a *Terry* stop reveals further evidence of criminal conduct. *See, e.g.*, *United States v. Kye Soo Lee*, 962 F.2d 430, 433–35 (5th Cir. 1992). On the other hand, if "the initial stages of [a Terry] encounter serve[ ] to dispel his reasonable fear for his own or others' safety," an officer may lack justification for frisking for weapons. *See Terry*, 392 U.S. at 30. The justification for a protective sweep likewise is circumscribed by the evolving facts. The protective sweep must cover no more than those spaces where police

reasonably suspect a person posing danger could be found, and must last no longer than necessary to dispel the suspicion and no longer than the police are otherwise constitutionally justified in remaining on the premises. *Gould*, 364 F.3d at 587.

For purposes of both *Terry* and *Gould*, underlying facts are reviewed for clear error, but the ultimate question of whether those facts add up to establish an appropriate level of reasonable articulable suspicion of criminality or danger is a question of law, reviewed *de novo*. *See Gould*, 364 F.3d at 592 & n.16.

### 3.    Analysis

#### a.    *Initial entry*

As an initial matter, Scroggins argues that the officers had no constitutional basis to enter the home. To the contrary, we find no reversible error in the district court's determination that they entered pursuant to Bell's consent.

The district court found that Bell consented, at least implicitly, to the officers entering the home, and we conclude that this finding was not clearly erroneous. It is undisputed that Bell was wearing revealing clothing and that she requested to enter the home to get other clothing before the officers took her away. It likewise is undisputed that DUSM Fomby informed her they would enter the house with her if she did. The need to accompany her was also self-evident, because Bell had been arrested and handcuffed by this point and would have struggled to collect her things without assistance. There was conflicting testimony on what happened next, but the district court expressly found that Bell then entered the home, and that police followed. In its oral ruling after the bench trial, the court stated:

> I think that Ms. Bell consented impliedly, if not expressly. It was her choice to decide whether to go back into the house when she knew that the officers would accompany her, and she chose to go in.

> I would have to say that the record is unclear whether she expressly verbally articulated consent. But I find that really immaterial because I think that there is very clearly implied consent from her decision to enter after she had been advised that they would be required to go in with her if she went in.

Scroggins does not assert that these findings were clearly erroneous. Indeed, he effectively concedes they were not, acknowledging that there was conflicting testimony on the subject and that "the record is unclear." Based on this concession and our own review of the record, we find no clear error in the district court's determination that, by entering the house under these circumstances, Bell signaled consent to the officers to enter as well. *Cf. United States v. Sihler*, 562 F.2d 349, 350–51 (5th Cir. 1977) (holding that defendant consented to a search by entering prison where warning sign advised that persons entering were subject to search).

Scroggins does not contest the remaining two elements for a valid consent search— voluntariness and Bell's authority to grant consent— but does present a novel argument based on analogy to the "exigent circumstances" exception to the warrant requirement. Under that exception, police may conduct a warrantless search or seizure in certain circumstances where there is not enough time to obtain a warrant, for example when in hot pursuit of a suspect, or when a suspect is attempting to destroy evidence. *See generally United States v. Richard*, 994 F.2d 244, 247–48 (5th Cir. 1993). However, police cannot incite or "manufacture" the exigent circumstances themselves and thereby circumvent the warrant requirement. *See United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995) ("Just as exigent circumstances are an exception to the warrant requirement, a police manufactured exigency is an exception to [the] exception."). Scroggins proposes, by analogy, that police cannot "manufacture" consent. He argues that since Bell was already clothed, there was no need for her to get additional clothing. Rather, "officers used the situation as their golden

key to gain entry when no necessity for entry existed," because they hoped to enter the house without a warrant to investigate the tip about the potential murder suspect.

This argument fails on multiple levels.    First, Scroggins cites no authority—and there is none—recognizing this concept of manufactured consent. The relevant analogue in the law of consent is voluntariness: police cannot "manufacture" consent in that they cannot obtain it by duress or coercion.  *See generally Schneckloth*, 412 U.S. at 222, 234.  Scroggins does not assert duress or coercion, and cannot circumvent the voluntary consent jurisprudence by applying exigent circumstances law instead.  Second, it would be strange indeed to hold that the Constitution *requires* police to deny a citizen's reasonable request to enter her residence and put on less revealing clothing before being taken into custody.  Among other difficulties, such a holding would conflict with well-established authority, uncontested by Scroggins, indicating that any resident of a home may independently consent to entry by police.  *See, e.g.*, *United States v. Ibarra*, 948 F.2d 903, 906–07 (5th Cir. 1991).   Finally, the manufactured consent theory lacks sufficient support in the record.  The district court generally credited the officers' testimony, including testimony that it was Bell's idea to enter the house for clothing, and that they accompanied her to accommodate the request and not as an investigatory tactic.  This testimony is consistent with the officers' decision to wait for Bell to appear on the porch before arresting her, rather than attempting to do so in the house.  For all these reasons, we reject Scroggins's manufactured consent argument.

We accordingly conclude that DUSM Fomby and the other officers did not violate the Fourth Amendment by initially entering the house.

### b.    *Protective sweep and detention of Scroggins*

The entry into the house became a protective sweep almost immediately, as the officers encountered Scroggins and pursued him when he withdrew.

No. 08-10966

Scroggins argues that they had no constitutional basis for conducting a protective sweep when they entered the house and no basis for detaining or frisking him pursuant to that sweep. He also asserts that the officers went beyond the bounds of a stop-and-frisk and essentially arrested him without a warrant. We conclude that the district court correctly ruled against Scroggins on these contentions.

As an initial matter, we have little difficulty concluding that the officers were justified in conducting a protective sweep upon entry. At the time they first entered the house, the officers had corroborated key elements of the anonymous tip, particularly that Bell would be at the house and that a man was inside. The tip also stated that the man with Bell may have been involved in murders. That was enough to provide articulable reasons to suspect that a man in the house might be a danger to them, or for that matter to Bell, and this justified at least a cursory sweep. *Gould*, 364 F.3d at 587. And in fact, that is all that took place. Immediately upon entering the house, officers observed Scroggins flee despite their commands. This escalated the situation and created new grounds for suspecting danger.

The next question is whether the officers acted consistently with the Fourth Amendment when they detained, handcuffed, and frisked Scroggins. Both the government and Scroggins brief this question primarily as one of reasonable suspicion of criminal activity under *Terry*.

The government argues there was reasonable suspicion to detain Scroggins because he fled from the officers, which, combined with the murder suspect tip, raised reasonable suspicion "that criminal activity might be afoot." *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (upholding determination of reasonable suspicion based on "unprovoked flight" of suspect on the street upon observing police). With regard to the manner of the *Terry* frisk, the government argues that the officers were within the bounds specified by our

11

precedents, particularly *United States v. Jordan*, 232 F.3d 447 (5th Cir. 2000). In *Jordan*, we explained that officers may take steps for their own safety in connection with a *Terry* frisk—handcuffing, for example—as long as they are not "unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *Id.* at 450.

Scroggins argues there was no basis for a *Terry* stop-and-frisk because the officers "were not properly marked as police upon entry," and therefore Scroggins's flight did not raise any suspicion of criminal behavior. He argues that at the time of the seizure the officers lacked reasonable suspicion for a *Terry* frisk, and further that by handcuffing Scroggins and requiring him to lie down to be frisked, and then not ever releasing him, they effected an arrest without probable cause.

We do not hold that the initial seizure was constitutional based on the government's theory of suspicion of criminal activity. It is true that Scroggins escalated the situation by disobeying the officers' commands and withdrawing from their sight, and we find no clear error in the district court's determination that the officers who entered the house were marked as police.[3] But the government cites no authority to support the proposition that police may stop and frisk an individual in his own home based on the same indications of criminality that would allow the detention elsewhere. The *Terry* doctrine was developed to determine when police could "detain individuals on the street," *Michelletti*, 13 F.3d at 840 (emphasis added). The threshold of the home,

---

[3] Scroggins asserts that "[t]he overwhelming information provided in the overall record in this case shows that it is very likely that police were not properly marked as police upon entry into Scroggins's home." But the question is not whether the police were "properly marked," and the standard of review is not likelihood. The district court found that DUSM Fomby and Special Agent Thompson had "visible badges" when they entered the house, and that "based on the testimony before me . . . one or more of them had visible . . . tactical vests with visible law enforcement insignia and visible lettering identifying them as police." These findings are a plausible interpretation of the record.

No. 08-10966

however, is an important boundary in Forth Amendment jurisprudence. *See, e.g,* *Payton v. New York*, 445 U.S. 573, 589–90 (1980) (citing *Silverman v. United States*, 365 U.S. 505, 511 (1980) ("[A]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (alterations omitted)). Even assuming the officers were marked as such, fleeing from armed men who enter one's home is not directly comparable, as an indicator of criminal activity, to the "unprovoked flight" of *Wardlow* and similar cases.[4]

It is not necessary for the government to justify the detention under *Terry*, however, because, as the government also argues, the protective sweep doctrine of *Gould* provides adequate justification.[5] As already discussed, the following elements must be present for a permissible protective sweep under *Gould*:

> First, the police must have entered legally and for a legitimate law enforcement purpose. Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene. Third, the protective sweep must be limited to a cursory inspection of only those spaces where

---

[4] In a similar vein, the permissible length of detention based on reasonable suspicion in the present context may differ from other contexts such as traffic stops. In connection with a protective sweep for safety, "officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises." *United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008) (citing *Gould*, 364 F.3d at 587). A detention based on reasonable suspicion of criminal activity is permissible only to the extent "the police diligently pursue[ ] a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686. Such diligence requirements are particularly urgent when considering possession of firearms in the home, which implicates both Second and Fourth Amendment rights and is not prima facie illegal.

[5] Our decision to uphold the initial seizure based on the protective sweep doctrine of *Gould*, without accepting the government's contention that reasonable suspicion of criminal activity also could have justified it, is consistent with the district court's suppression ruling and the testimony of the officers. The district court ruled that the officers were "entitled to frisk Scroggins for safety," and no witness among the officers testified that suspicion of criminality motivated the stop-and-frisk.

13

No. 08-10966

a person may hide; it is not a full search of the premises. Finally, officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

*United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008) (citing *Gould*, 364 F.3d at 587). As with *Terry* frisks, the purpose of the sweep is to protect officers' safety. *See Gould*, 364 F.3d at 581, 582–583. It follows that if a protective sweep for potentially dangerous individuals *locates* such an individual, police may detain and frisk the subject, and, if necessary, temporarily handcuff or otherwise reasonably immobilize him. *Cf. Jordan*, 232 F.3d at 449–50.

The seizure and questioning of Scroggins was constitutional under these principles. First, the officers permissibly entered the house with consent. Second, they had reason to suspect that a man that was possibly involved with some murders was present in the home. They encountered Scroggins immediately and called for him to halt, but he withdrew to a bedroom out of their view, from which they subsequently heard a loud noise. Whether Scroggins was fleeing from police, or, less plausibly, retreating from what he thought was a non-police group of aggressive invaders, the largely confirmed tip and Scroggins's conduct provided articulable grounds for concern that he presented a danger. Third, the sweep, to this point, was extremely cursory. The officers merely identified Scroggins and required him to emerge from hiding and submit to a frisk. They had not yet searched the rest of the house. Fourth, the duration of the sweep to this point was negligible. Furthermore, as to the manner of the seizure, considering that the house was not yet secure and that there was a commotion immediately prior to Scroggins's submission, it was not unreasonable for the officers to order Scroggins to the ground and handcuff him before frisking him. *Cf. Jordan*, 232 F.3d at 449–50. Finally, as the purpose of the detention

14

No. 08-10966

was to maintain safety, and Scroggins was found to have ammunition when frisked, it was reasonable for DUSM Fomby to ask about the location of firearms in the home.

The officers were also within the bounds of *Gould* when they conducted a further sweep of the house, including the room into which Scroggins had fled, where they observed in plain sight the weapons that would underlie his conviction. Scroggins argues that there were no grounds to suspect danger once he was handcuffed, but the district court articulated a number of grounds:

> After discovering the magazine, the officers were justified in performing a protective sweep of the House, for two reasons. First, the agent did not know whether anyone else was in the House, and knew an unsecured firearm was in the House. Second, the anonymous tip at this point had been corroborated by both the presence of Bell at the House, and the presence of the vehicle mentioned in the tip; thus, the officers had reason to believe someone in the [H]ouse was involved in a violent crime, and did not know if that was Scroggins, who was secured, or someone else in the [H]ouse. Either alternative would justify a protective sweep.

We agree with the district court that after detaining Scroggins, the officers had reasonable, articulable grounds to continue to suspect danger, and we hold that the protective sweep of the house—and the location and eventual seizure of Scroggins's firearms in plain view—was permissible.[6]

Our rulings to this point require affirmance of the district court's refusal to suppress the firearms and ammunition clip, and Scroggins's initial statements concerning them. The Fourth Amendment exclusionary rule operates to suppress only evidence derived from a Fourth Amendment violation. "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly

---

[6] Apart from the contention that no further sweep at all was necessary, Scroggins does not challenge the scope or duration of the further sweep or the seizure of the firearms in plain view as exceeding the bounds set by *Gould*.

No. 08-10966

subject to exclusion," *Segura v. United States*, 468 U.S. 796, 804 (1984) (emphasis added), as is "evidence later discovered and found to be derivative of any illegality or 'fruit of the poisonous tree.'" *Id.* (citations and internal quotation marks omitted). This "fruit of the poisonous tree" doctrine is limited to evidence "derived from the exploitation of an illegal search or seizure." *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999) (emphasis added). If there is no causal connection, the exclusionary rule does not apply. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 683 (1985) ("It is not necessary for us to decide whether the length of Sharpe's detention was unreasonable, because that detention bears no causal relation to Agent Cooke's discovery of the Marihuana.") Here, the officers discovered the ammunition clip, elicited the location of the related firearm, and located that and another firearm in plain view, all in connection with what we have held to be a constitutionally permissible protective sweep and frisk.

      *c.*    *Wallet-search*

Scroggins also asserts that DUSM Fomby impermissibly seized and searched his wallet, and thereby discovered his identity. Scroggins's counsel conceded at oral argument that the wallet-search bore no causal relationship to the discovery of the firearms, but proposed that the district court should have suppressed Scroggins's *status as a felon*, which came to light based on investigation of his identity as ascertained in the wallet-search. We conclude that the seizure of the wallet was permissible in connection with the frisk and protective sweep. DUSM Fomby testified that he removed all hard objects from Scroggins's pockets in the course of the frisk, and we discern no constitutional violation in his removal of the wallet along with the ammunition clips. The subsequent search of the wallet is a separate and more difficult issue, but we conclude that Scroggins failed to properly raise this argument on appeal and in

No. 08-10966

the district court, and that it is subject to plain error review to the extent it is before us at all. Scroggins has not demonstrated plain error on this point.

As an initial matter, Scroggins has not properly challenged the search of the wallet on appeal. A recent opinion summarized our authority on appellate briefing requirements as follows:

> A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it. *United States v. Skilling*, 554 F.3d 529, 568 n.63 (5th Cir. 2009) (citing *United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989)). It is not enough to merely mention or allude to a legal theory. *See, e.g., McIntosh v. Partridge*, 540 F.3d 315, 325 n.12 (5th Cir. 2008) ("McIntosh occasionally mentions an 'equal protection' claim in conjunction with his due process claim, but this claim is inadequately briefed and is hence waived."). We have often stated that a party must "press" its claims. *See, e.g., Davis v. Maggio*, 706 F.2d 568, 571 (5th Cir. 1983) ("Claims not pressed on appeal are deemed abandoned."). At the very least, this means clearly identifying a theory as a proposed basis for deciding the case—merely "intimat[ing]" an argument is not the same as "pressing" it. *Cf. FDIC. v. Mijalis*, 15 F.3d 1314, 1326-27 (5th Cir. 1994) ("If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court."). In addition, among other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and "any relevant Fifth Circuit cases." *Skilling*, 554 F.3d at 568 n.63; *see also* Fed. R. App. P. 28(a)(9) (stating that briefs must include "contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies."); *Coury v. Moss*, 529 F.3d 579, 587 (5th Cir. 2008) (deeming estoppel argument waived where defendants cited cases but failed to "explain how these cases constitute authority for their bare assertion that [plaintiff] is estopped to bring this litigation"). We look to an appellant's initial brief to determine the adequately asserted bases for relief. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

17

No. 08-10966

*Knatt v. Hospital Serv. Dist No. 1 of E. Baton Rouge Parish*, 327 Fed. Appx. 472, 483 (5th Cir. 2009) (unpublished).[7]

Scroggins fails to adequately raise the wallet-search issue under these standards. His initial brief focuses almost entirely on his arguments that the officers entered the house without consent, and that they lacked grounds to detain and frisk Scroggins. The wallet-search issue appears as an afterthought. It is mentioned in the questions presented and the summary of argument, but the body of the brief does not discuss it in any depth. The brief merely mentions it in conclusory sentences tacked to the end of paragraphs challenging other aspects of the frisk. *See, e.g.*, Appellant's Br. at 33 ("The seizure of Scroggins' wallet and information contained in the contents of his wallet further should have been suppressed pursuant to *Terry v. Ohio*, 392 U.S. 1; 88 S. Ct. 1868 (1968) and its progeny."). There is no citation to or discussion of *Terry's* progeny, which includes thousands of cases—many concerning requests for identification—decided over the last 40 years. The issue is accordingly not adequately presented.[8]

---

[7] We cite this unpublished opinion because we consider its summary of prior, published authority to be sound.

[8] Scroggins's Reply attempts to remedy this deficiency by citing several cases from other jurisdictions, including *People v. Williams*, 234 N.W.2d 541 (Mich. Ct. App. 1975) and *State v. Biegel*, 787 P.2d 577 (Wash. Ct. App. 1990), which held seizures or searches of wallets to be outside the bounds of *Terry* frisks. Our waiver inquiry focuses on the main brief, however, and these cases do not remedy Scroggins's failure to engage the issue on the basis of binding precedent. We likewise consider the citations and brief discussion that Scroggins presented in post-briefing letters under Federal Rule of Appellate Procedure 28(j) to be too little and too late to raise the issue properly.

Scroggins does not, in his main Brief, Reply, or any letter brief, discuss whether, and if so in what circumstances, it is ever appropriate to suppress the government's evidence of a felon's status as such.

No. 08-10966

Even if it were raised on appeal properly, Scroggins also did not properly raise the wallet-search issue in the district court.[9]  Federal Rule of Criminal Procedure 12(b)(3)(C) requires that a motion to suppress evidence "must be raised before trial," and Rule 12(e) states that "[a] party waives any Rule 12(b)(3) defense, objection, request not raised by the deadline the court sets . . . ."  There is divided authority in the circuits as to "whether arguments not raised in a motion to suppress are waived or are merely forfeited and subject to plain-error review."  *United States v. Baker*, 538 F.3d 324, 328–29 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 962 (2009).  Our circuit follows the former view, holding that "a defendant who fails to make a timely suppression motion cannot raise that claim for the first time on appeal," and also that "failure to raise *specific issues or arguments* in pre-trial suppression proceedings operates as a waiver of those issues or arguments for appeal."  *United States v. Pope*, 467 F.3d 912, 918–19 (5th Cir. 2006) (citations omitted).  Nonetheless, our cases identifying such waiver have often proceeded to evaluate the issues under a plain error standard for good measure.  *See Baker*, 538 F.3d at 329.

Scroggins's original motion to suppress sought suppression of "the evidence seized from the home and the statements made by Mr. Scroggins subsequent to his arrest," on the basis of "the warrantless entry into Mr. Scroggins's home."  At the hearing on this motion, the district court raised the permissibility of the protective sweep and frisk.  The court thereafter ruled on the entry into the home as well as the sweep and detention, concluding that the

---

[9] Our discussion of the failure to adequately brief this issue at the appellate level and raise it below should not be understood as criticism of Scroggins's counsel.  Both sides in this complicated case have been ably represented.  Scroggins's counsel made defensible decisions to emphasize arguments that, if successful, would have required suppression of the firearms, as opposed to the wallet-search, which could only raise the more difficult issue of suppressing evidence of Scroggins's status as a felon.

No. 08-10966

officers discovered the firearms by lawful means. The wallet-search and the possibility of suppressing Scroggins's felon status were not at issue. With new, appointed counsel Scroggins later moved for rehearing of the motion to suppress, and for reconsideration when that motion was denied.[10] These motions presented additional suppression arguments that Scroggins intended to make in connection with a new hearing— for example, that Bell lacked the "mental capacity to grant consent to enter," and that the frisk entailed a level of force and restriction beyond the scope of *Terry*. The motions concerned only the conduct leading to the discovery of the firearms.[11] They did not mention the wallet-search, and expressed no intention to move to suppress Scroggins's felon status. Finally, at the bench trial, Scroggins elicited extensive testimony from the officers concerning the entry into the home and the circumstances of the frisk, including brief testimony concerning the wallet-search. But during the trial and in its closing arguments, counsel focused on the entry into the house and the grounds (or lack there of) for detaining and frisking Scroggins. There was no argument that the wallet-search was a constitutional violation, or that any violation required suppression of Scroggins's felon status. The government first encountered these arguments on appeal.

Under these circumstances, assuming *arguendo* that the issue is properly raised in the appellate briefs, we conclude it is appropriate to review the issue for plain error. The government has asked for plain error review rather than waiver, and our cases have analyzed issues under the plain error standard even

---

[10] Scroggins has not contended on appeal that the denial of these motions was an abuse of discretion.

[11] For example, the analysis in the motion for reconsideration concludes as follows: "Putting Mr. Scroggins on the ground, handcuffing him, and searching him and thereafter gaining information regarding firearms requires that the evidence seized as a result of this illegal contact (1 magazine and two guns) be suppressed."

20

No. 08-10966

after concluding they were waived. *See Baker*, 538 F.3d at 329. Furthermore, the distinctive procedural circumstances counsel in favor of treating the wallet-search issue as forfeited, rather than voluntarily waived. *See generally United States v. Chavez-Valencia*, 116 F.3d 127, 130 (5th Cir. 1997).

Under the plain error standard, we make three initial determinations: (1) whether the district court committed error; (2) whether the error is clear and obvious; and (3) whether the error affects substantial rights. *United States v. Stephens*, 487 F.3d 232, 242 (5th Cir. 2007). If these conditions are met, we have discretion to reverse the district court if the error seriously affects "the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Scroggins fails to show plain error concerning the wallet-search, as it is far from "clear and obvious" that Scroggins's status as a felon can be suppressed at all.[12] The Supreme Court has stated that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984); *cf. United States v. Ceccolini*, 435 U.S. 268, 279–280 (1978) (holding that suppression of witness testimony was not required when the government learned the witness's identity by means of an illegal search). The proper interpretation

---

[12] The Fourth Amendment exclusionary rule frequently requires suppression of evidence obtained through a Fourth Amendment violation, but "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 129 S.Ct. 695, 699 (2009). The defendant has no personal constitutional right to suppression, *id.* at 700, and "the exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." *United States v. Leon*, 468 U.S. 897, 906 (1984) (citation and internal quotation marks omitted). Rather, the rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Id.* The Supreme Court has accordingly limited the scope of the rule to those circumstances "where its remedial objectives are thought most efficaciously served." *Segura v. United States*, 468 U.S. 796, 804 (1984).

of *Lopez-Mendoza* has "bedeviled and divided [the] circuits," *United States v. Oscar-Torres*, 507 F.3d 224, 228 (4th Cir. 2007), and there is divided authority as to whether identity-related information—including information on file with the government concerning a defendant's legal status—is ever suppressible.[13]

Our precedents concerning prosecution for illegal reentry hold on several grounds that immigration and deportation records are not suppressible, even if officers on the scene become aware of a defendant's immigration status by means of a constitutional violation. In *United States v. Martinez*, 512 F.2d 830 (5th Cir. 1975), we held it unnecessary to determine whether a defendant should have been given *Miranda* warnings prior to confessing his immigration status, because "the I.N.S. file on appellant . . . already existed, and it was located in the records of the same government agency and in the same city." *Id.* at 832. Accordingly, that information could not be considered derived from a constitutional violation. *Id.*; *cf. United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001) ("Otherwise suppressible testimony or evidence should be admitted if it derives from an independent source, if the link to the illegally secured evidence is attenuated, or if it would inevitably have been discovered without the

---

[13] The Third Circuit, for example, has interpreted *Lopez-Mendoza* broadly, and held that a defendant lacks a proprietary interest or expectation of privacy with respect to immigration information on file with the government, and that absent egregious circumstances "a defendant's immigration file or identity" is not suppressible in a prosecution for illegal reentry. *United States v. Bowley*, 435 F.3d 426, 430–31 (3d Cir. 2006). On the other hand, the Tenth Circuit has interpreted *Lopez-Mendoza* merely to concern jurisdiction over an illegally arrested defendant, and held that a defendant's fingerprints, statements concerning his identity, and previous deportation status could be suppressed. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1109 (10th Cir. 2006). The Eleventh Circuit found a middle ground between these views, agreeing with the narrow interpretation of *Lopez-Mendoza,* but nonetheless holding that illegally obtained identification information is not suppressible, and that "an I.N.S. alien file [is] not the product of any unconstitutional activity because it already existed and was located in the records of a government agency." *United States v. Farias-Gonzalez*, 556 F.3d 1181, 1185–87 (11th Cir.) (citing *United States v. Martinez*, 512 F.2d 830 (5th Cir. 1975)), *cert. denied*, 130 S.Ct. 74 (2009).

aid of the illegally obtained evidence."). We reached a similar holding on another ground in *United States v. Pineda-Chinchilla*, 712 F.2d 942 (5th Cir. 1983). When police discovered the defendant's status as a previously deported alien in the course of an allegedly illegal arrest, we held that he had "no possessory or proprietary interest in the INS or the documentary information contained in that file," and therefore "no legitimate expectation of privacy in the file [and] no standing to challenge its introduction into evidence." *Id.* at 943–44. In *United States v. Roque-Villanueva*, 175 F.3d 345 (5th Cir. 1999), we followed *Pineda-Chinchilla* and read the Supreme Court's statement in *Lopez-Mendoza* broadly, holding that regardless of whether the defendant had been illegally stopped and questioned, "neither his identity nor his INS file [were] suppressible." *Id.* at 346.

This authority cuts against any finding of plain error regarding Scroggins's argument that the district court should have suppressed evidence of his felon status. We do not reach the question of whether there was error in the first instance, because we have not had the benefit of adversary briefing on it, and because this case potentially raises issues not present in the illegal reentry cases. But in light of our case law, we cannot conclude that failure to suppress Scroggins's felon status could constitute clear and obvious error. Accordingly, the district court did not plainly err by failing to suppress evidence of that status, and it is not necessary for us to decide whether the officers on the scene became aware of it by means of a constitutional violation.[14]

---

[14] We note, however, that on the present record and briefing this is a difficult question. The government has offered no authority or safety-related rationale to support the wallet-search under *Gould*. It may be that even if the officers lacked grounds for a *Terry* stop at the outset of the detention, the situation had evolved by the time of the wallet-search such that they could reasonably suspect Scroggins of criminality on bases that could justify searching identification documents. *See generally Hiibel v. Sixth Judicial Ct. of Nev.*, 542 U.S. 177, 186–89 (2004) (upholding statute allowing police to arrest a person who refuses to identify himself in a traffic stop, but noting doubt in prior opinions on whether police may generally

## B.    Second Amendment arguments

Scroggins also argues that his conviction for possession of firearms by a felon, without any further showing of violent intent, violates his Second Amendment rights under *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). This claim was not raised below, and Scroggins does not contest that it is subject to review for plain error only.

We find no clear and obvious error with respect to Scroggins's Second Amendment arguments because those arguments are foreclosed by our circuit's existing precedent. Prior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate that right. *See United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); *United States v. Darrington,* 351 F.3d 632, 633–34 (5th Cir. 2003); *United States v. Emerson*, 270 F.3d 203, 260–61 (5th Cir. 2001). Dicta in *Heller* states that the opinion should not "be taken to cast doubt on long-standing prohibitions on possession of firearms by felons," 128 S. Ct. at 2816–17, and we have reaffirmed our prior jurisprudence on this point since *Heller* was decided. *See United States v. Anderson*, 559 F.3d 348, 352 (5th Cir.) ("*Heller* provides no basis for reconsidering *Darrington*"), *cert. denied*, 129 S.Ct. 2814 (2009). Scroggins

---

require *Terry* stop suspects to answer identification questions); *United States v. Hensley*, 469 U.S. 221, 232 (1985) (holding that police may stop an individual "to check identification" when the grounds for reasonably suspecting him of a crime include suspicion that he is the individual depicted in a "wanted flyer"). There are gaps and inconsistencies in the record as to the facts that would inform a determination as to whether there were grounds for such suspicion. Given the procedural history and plain error standard of review, we would consider it inappropriate to hold that circumstance against the government. *See Chavez-Valencia*, 116 F.3d at 131–32 (noting that a defendant's failure to raise suppression issues in the trial court prejudices the government's ability to build the record for appeal).

No. 08-10966

presents no Second Amendment argument that our cases have not already considered and rejected, and he identifies no plain error on this ground.

## III. CONCLUSION

We conclude that law enforcement personnel discovered ammunition and firearms in Scroggins's possession pursuant to a constitutionally permissive protective sweep, and that, even assuming that the officers on the scene learned of his felon status by means of a constitutional violation, Scroggins has not shown plain error regarding any failure to suppress evidence of that status. We accordingly find no reversible error in the district court's determination that there was adequate evidence, not subject to suppression, to convict Scroggins. AFFIRMED.