# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30198

United States Court of Appeals
Fifth Circuit

**FILED**
January 24, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GROSS WILLIAMS,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and JOLLY and OWEN, Circuit Judges.

CARL E. STEWART, Chief Judge:

Defendant-Appellant Gross Williams appeals the district court's rulings denying his motions to suppress.  For the following reasons, we affirm.

## I.    Facts & Procedural History

Defendant-Appellant Gross Williams was convicted in 2012 in Iberville Parish on state charges of distributing marijuana and placed on five years of probation.  Conditions of Williams's probation included permitting home visits from the probation officer, refraining from owning or possessing firearms, and consenting to probation officer searches of his person or property at any time with or without an arrest warrant.  Specifically, Condition 13 of his probation conditions provided that Williams was required to:

> Agree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any

time, by the probation officer or the parole officer assigned to him, with or without a warrant of arrest or with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that [Williams] is engaged in or has been engaged in criminal activity.

Probation officer Patrick Green testified that during the term of Williams's probation, he was a model probationer and as a result, in 2014 Officer Green began the process of drafting a "petition for cause" to request that the court terminate Williams's probation early. While Officer Green was writing the petition, he received a call from his district administrator to report to his office where a meeting was being held with the Drug Enforcement Administration (DEA). Officer Green was then informed that the New Orleans Police Department (NOPD) and the DEA had determined that Williams was involved in the narcotic trafficking of large amounts of heroin. Officer Green testified that he was "shocked" at the news.

As a result of the tip from the NOPD and DEA and his knowledge of Williams's prior criminal history involving drugs, including the offense for which he was currently on probation, Officer Green concluded that he was warranted in conducting a compliance check on Williams. Officer Green called Williams and asked him to come to his office but Williams said he could not leave his dealership because he was the only person there. Consequently, Officer Green, along with several other probation officers and law enforcement from a neighboring parish, traveled to Williams's car dealership to begin the process of the compliance check which would traditionally involve transporting Williams to his home to investigate further. When he arrived at the dealership, Officer Green testified that he walked up to Williams and "noticed that he had bulges underneath his clothing" so he asked Williams "do you have anything on you I need to know about, anything illegal, any sharp, anything

that could hurt me[?]" Williams replied no but then stated that he had cash in his pockets. Officer Green testified that at that point, he Mirandized Williams and then "started to conduct a frisk, a pat-down, in which I felt large objects underneath in his pockets. I then removed those objects and they turned out to be wads of cash from both his shirt and his pants. And the reason I removed those is I wanted to see if there were any weapons on the other side of him with the large bulges. I could not tell what else was in his pockets." Officer Green testified that as a result of the pat-down, he found in Williams's shirt and pants pockets "wads of cash that had been . . . folded over in half of varying denominations, ones, fives, tens, 20s, 100s—not all of it in the same numerical order and varying amounts in different pockets." Officer Green continued, "I asked him where the money came from, and he told me that the money had come from the car dealership from him selling the cars." Although Williams had estimated that the cash totaled approximately $14,000, law enforcement counted $10,000. Officer Green testified that he found this large amount of cash odd since Williams had previously reported that he made approximately $2,500 per month in income. Officer Green further noted that it seemed strange that Williams had reported that he was alone at the car dealership but when officers arrived, Williams's wife was there.

Thereafter, Officer Green continued conversing with Williams and obtained his consent to search his business. Officers walked a drug dog around the dealership and nothing was discovered except approximately $2,000 in cash. DEA agents then arrived and asked Williams where the cash on his person came from. He replied that a person named "Twon" had given him the money to buy cars at an auction. Officer Green testified that this information put him on alert because not only was it a contradictory answer to the explanation Williams had given him for having the money but also because Twon was "the largest drug dealer in the New Orleans East area." A drug dog

subsequently alerted to the presence of drug residue on the cash that was found on Williams's person.

Officers then obtained consent to search Williams's mother's home on Caffin Street because her address was listed on the incorporation papers to his business. In an effort to end the ongoing search of his mother's home, Williams voluntarily stated to officers: "What you are looking for is at my house. I have a gun and money at my residence." No contraband was discovered at Williams's mother's house. Officers then traveled to Williams's personal residence on Sandalwood where they again formally obtained Williams's consent to search. There, officers found $2,000 on a closet shelf and subsequently seized over $425,000 in cash in a safe and a .40 caliber Smith and Wesson pistol in the nightstand drawer. A K-9 unit again alerted to the presence of drug residue on the cash. The probation officers turned the gun over to the NOPD who arrested Williams on charges of being a felon in possession of a firearm.

In January 2015, a federal grand jury returned a five-count indictment charging Williams with conspiring to possess with the intent to distribute and distributing heroin and cocaine, possession of a firearm in furtherance of a drug trafficking crime, being a felon in possession of a firearm, and money laundering. Following his indictment, Williams moved to suppress the evidence officers seized on the day of his arrest. The district court held an evidentiary hearing and denied the motion, concluding that Officer Green had "sufficient probable cause and reasonable suspicion, under the case law, to justify the actions that took place [after the initial frisk of Williams's person] at the two addresses, the Caffin Street address and the Sandalwood address." Later, Williams filed a "Second Motion to Suppress Evidence" which was construed as a motion to reconsider the denial of his motion to suppress and

No. 17-30198

the motion was again denied.[1][2]  In denying the motion, the district court stated, "In short, Williams' instant motion raises no evidence or argument not previously considered in connection with his first motion."

Williams ultimately entered a guilty plea to two counts and signed a factual basis admitting to criminal conduct.  The two counts were: (1) conspiracy to distribute and possess with intent to distribute 1kg or more of heroin and 5kgs or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, 851(a)(1); and (2) possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).  He was sentenced to 23 years of imprisonment to be followed by a ten-year term of supervised release.  In his plea agreement, Williams retained the right to appeal the district court's rulings on his motions to suppress and to withdraw the plea if the appeal was successful.  This appeal followed.

## II.    Standard of Review

When reviewing a denial of a motion to suppress evidence, we review the district court's factual findings for clear error and its legal conclusions, including the ultimate constitutionality of the actions of law enforcement, de novo.  *United States v. Zuniga*, 860 F.3d 276, 280 (5th Cir. 2017) (citing *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014)).  "The evidence is viewed

---

[1] During the hearing on the second motion to suppress, the Government presented *Giglio* information that it had obtained in preparation for trial related to Officer Green and his involvement in an incident that occurred in 2011.  Officer Green retook the stand to address the prior finding of untruthfulness in connection with a previous disciplinary action taken as a result of his having improper license plates on his vehicle.  Officer Green's testimony regarding his prior disciplinary proceedings ultimately had no bearing on the district court's findings related to Williams's proceedings and as mentioned, the second motion to suppress was denied.

[2] At the end of the hearing on the second motion to suppress, Williams stated that he had surveillance video footage from the dealership that captured the events that took place there.  The parties stipulated to the events that took place on the video and entered it into the record, along with additional briefing, prior to the district court's ruling denying the second motion to suppress.

in the light most favorable to the prevailing party," which here, is the Government. *Zuniga*, 860 F.3d at 280–81.

### III.  Discussion

Williams devotes the majority of his argument on appeal to attacking the validity of Officer Green's initial frisk of him at his car dealership because, according to Williams, if the initial frisk was unlawful, then the subsequent searches were also unlawful.  Given the record evidence in this case, Williams's argument fails.

The Fourth Amendment guarantees protection to individuals "against unreasonable searches and seizures." *Id.* at 281 (citing U.S. Const. amend. IV). The Supreme Court has recognized, however, that "[t]o a greater or lesser degree, it is always true of probationers . . . that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)[3] (internal quotation marks omitted). "Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *United States v. Knights*, 534 U.S. 112, 119 (2001).  As this court has acknowledged,

---

[3] The Supreme Court explained in *Griffin* that:

Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty. Probation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service. A number of different options lie between those extremes, including confinement in a medium- or minimum-security facility, work-release programs, halfway houses, and probation—which can itself be more or less confining depending upon the number and severity of restrictions imposed.

483 U.S. at 874 (internal quotation marks and citations omitted).

"reasonable restrictions upon liberty and privacy are allowed and are necessary to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *United States v. LeBlanc*, 490 F.3d 361, 365–66 (5th Cir. 2007) (quoting *Griffin*, 483 U.S. at 875) (internal quotation marks omitted). "These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed . . . . Supervision, then, is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 366.

With regard to conducting "reasonable" searches of probationers, the Supreme Court explained in *Griffin* that the probation agency "must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances." 483 U.S. at 879. Moreover, the Court observed that it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search." *Id.* at 879–80. One reason justifying this policy, the Court determined, is that "the police may be unwilling to disclose their confidential sources to probation personnel." *Id.* at 880. The Court continued, "[f]or the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates . . . only the likelihood ('had or might have guns') of facts justifying the search." *Id.*

This court has recognized that "[u]nder *Terry*, officers may briefly detain an individual on the street for questioning, without probable cause, when they possess reasonable, articulable suspicion of criminal activity." *United States*

*v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010). Further, "to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry." *Id.* This court has noted that a *Terry*-style frisk may continue if an officer observes or feels bulges on a suspect's person "so long as an officer is investigating an object that reasonably may be a weapon." *United States v. Majors*, 328 F.3d 791, 795 (5th Cir. 2003) (noting that the officer could not rule out the possibility that the bulge in the defendant's pocket was a weapon since it was "bigger than a softball" and "in between hard and soft" and, combined with the officer's knowledge of the defendant's criminal history involving narcotics and weapons, it was reasonable to believe that the defendant might be armed). Moreover, this court has explicitly held that "a police officer's protective search might properly include seizure of an object that feels like a wad of folded bills concealing a weapon." *United States v. Ponce*, 8 F.3d 989, 999 (5th Cir. 1993); *see also United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) (observing that the officer "had not ruled out the possibility that the large bulge was a weapon, and [thus] his removal of the pocket's contents was not beyond the scope of a permissible *Terry* frisk").

A probationer's residence is protected by the Fourth Amendment's requirement that searches and intrusions upon privacy be "reasonable." *LeBlanc*, 490 F.3d at 365. "Although it is usually required that a search be undertaken only pursuant to a warrant . . . the Supreme Court has permitted exceptions when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* (internal quotation marks and citations omitted). With respect to both personal and residential searches, the Louisiana Fifth Circuit Court of Appeal has explained that "[a] probationer must necessarily have a reduced expectation of privacy, which allows for reasonable warrantless searches of his

person and residence by his probation officer, even though less than probable cause may be shown." *State v. Saulsby*, 892 So.2d 655, 657–58 (La. App. 5th Cir. 12/28/04).

This circuit has also noted that "home visits" or compliance checks, as defined under Louisiana law and as a condition of probation, "do not constitute as invasive a burden on a probationer's expectations of privacy as does a search. A probationer is subject to state supervision as part of the 'special needs' doctrine, including verification of where he lives, and cannot expect to be free from 'interpersonal contact' at his residence." *LeBlanc*, 490 F.3d at 368–69. Additionally, this court has observed that if it were to "impose a requirement that a probation officer show reasonable suspicion of criminal activity before visiting a probationer at his home, supervision would become effectively impossible." *Id.* at 369 (concluding that a brief walk-through of the rooms in a probationer's home and a plain-view seizure of a shotgun did not violate probationer's Fourth Amendment rights).

Here, as an initial matter, the plain text of Williams's probation conditions requires that he "[a]gree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any time, by the probation officer . . . with or without a warrant . . . when the probation officer . . . has reasonable suspicion to believe that [Williams] is engaged in or has been engaged in criminal activity." The question then becomes whether officers had "reasonable suspicion" to conduct the searches of Williams's property. We conclude that he did.

The Supreme Court specifically acknowledged in *Griffin* that tips given to a probation officer from other law enforcement officers are sufficient to support reasonable suspicion to conduct a search of a probationer. *See* 483 U.S. at 879–80 (observing that it is "reasonable to permit information provided by

a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search"). Additionally, as the Court further observed in *Griffin*, in deciding whether to conduct a search of a probationer, the probation officer "must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances." *Id.* at 879. Here, Officer Green provided a number of factors he considered based on his experience with Williams that would support reasonable suspicion to conduct a search once he received the tip from state and federal law enforcement. Specifically, Officer Green testified:

> So in my mental checklist . . . he's on [probation] for distributing drugs. DEA is telling me he's probably distributing drugs or that they think he is. But I'm still trying to give him the benefit of the doubt. He's got multiple previous convictions for distributing drugs. He lives in a fortress. I mean, his house is built like a fortress. You can't get in without going through the [four large pit bulls] or somebody letting you in. So I need to look into this. On face value, this is not looking good.

The tip, these factors, and Officer Green's past experience with Williams were sufficient to support Officer Green's decision to conduct a search of Williams's residence. Once officers arrived at the dealership to transport Williams to his home (since Williams would not leave his business), Officer Green was warranted in conducting a *Terry*-style frisk of Williams, which, here, was preceded by *Miranda* warnings.[4] This pat-down was justified to ensure that officers were not at risk from Williams potentially being armed when they

---

[4] Officer Green testified that he Mirandized Williams prior to frisking him because "on probation, in parole, persons under supervision do not have a right to remain silent [but] I wanted him to understand that this was borderline criminal—this was a criminal investigation at this point, because I got information from DEA that he was involved in criminal activity. So I wanted him to understand that he had rights, that . . . [f]rom this point forward, he does have a right to remain silent. He does have a right to an attorney. He does have a right to question things in a court of law."

arrived at the dealership to conduct a search. *See Scroggins*, 599 F.3d at 441 (observing that, under *Terry*, "to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry"). The large visible bulges in Williams's pockets further supported Officer Green's decision to conduct the frisk.[5] As noted previously, this court has concluded that a *Terry*-style frisk may continue if an officer observes or feels bulges on a suspect's person "so long as an officer is investigating an object that reasonably may be a weapon." *Majors*, 328 F.3d at 795 (noting that the officer could not rule out the possibility that the bulge in the defendant's pocket was a weapon since it was "bigger than a softball" and "in between hard and soft" and combined with the officer's knowledge of the defendant's criminal history involving narcotics and weapons, it was reasonable to believe that the defendant might be armed). Moreover, this court has explicitly recognized the validity of a protective search that "include[s] seizure of an object that feels like a wad of folded bills concealing a weapon." *Ponce*, 8 F.3d at 999; *see also Campbell*, 178 F.3d at 349 (observing that the officer "had not ruled out the

---

[5] Officer Green testified "I wanted to make sure that—the allegation was that he was a major player in narcotics. Where there is drugs, there is guns, and so I wanted to make sure the person I was talking to didn't have any guns on him." He continued, "I then started to conduct a frisk, a pat-down, in which I felt large objects underneath in his pockets. I then removed those objects and they turned out to be wads of cash from both his shirt and his pants. And the reason I removed those is I wanted to see if there were any weapons on the other side of him with the large bulges. I could not tell what else was in his pockets."

possibility that the large bulge was a weapon, and [thus] his removal of the pocket's contents was not beyond the scope of a permissible *Terry* frisk").[6]

Additionally, officers obtained consent to search Williams's car dealership,[7] his mother's home on Caffin Street, and his own home at the Sandalwood address. Here, in spite of Williams's consent to search his car dealership, reasonable suspicion to search the business independently arose once the $10,000 in cash was seized from his pockets pursuant to Officer Green's lawful protective frisk and the K-9's subsequent alert to the presence of drug residue on the cash. This reasonable suspicion was further supported by Officer Green's knowledge that Williams reported only $2,500 per month in income and because Williams gave conflicting reasons to the source of the cash, ultimately stating that the cash came from a person named Twon who is known by law enforcement to be a major drug dealer in New Orleans. This reasonable suspicion likewise supported the search of Williams's mother's house on Caffin Street (which officers also obtained express consent to search) since that address was listed on the incorporation papers of his car dealership and was also a location at which Williams was previously arrested on drug charges in 2003.

---

[6] Although Williams devotes a significant portion of his argument to the notion that he did not consent to Officer Green's frisk of his person, the Government does not argue that Williams consented to the frisk and, regardless, his consent was not required to justify a protective pat-down/frisk. *See United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) ("It is without question that [the defendant] did not consent to the pat-down search, but limited pat-down searches are permissible 'for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))).

[7] Williams specifies that the search of his car dealership was "allegedly consensual" and that the Government presented "disputed" evidence that he consented to a search of the premises.

No. 17-30198

Moreover, while officers were searching Williams's mother's house on Caffin Street (relative to that address being associated with his business), Williams volunteered to officers that "[w]hat you are looking for is at my house. I have a gun and money at my residence." Accordingly, Williams expressly admitted that he was guilty of being a felon in possession of a firearm and, as would later be revealed, that he had enough cash ($425,000) to support the reasonable conclusion that he was involved in drug trafficking—a notion bolstered by the fact that a K-9 also alerted to the presence of drug residue on the cash found in Williams's home. Considering that Williams volunteered to officers that he had cash and a firearm at his home, officers had additional independent adequate reasonable suspicion based on Williams's volunteered admission to conduct a full search of Williams's personal residence.

On these facts, we conclude that officers had reasonable suspicion to conduct the searches of Williams's residence, his dealership, and his mother's home. We further conclude that Officer Green's *Terry*-style frisk of Williams once he arrived at the dealership to transport Williams to his residence was proper given the visible bulges in Williams's pockets that were large enough to conceal weapons.[8]

In light of the foregoing, the district court did not err in denying Williams's motions to suppress. *Zuniga*, 860 F.3d at 280.

---

[8] Williams's contention that "[t]he frisk was not justified by concerns for officer safety" is also misplaced. Citing *Terry*, he claims that because officers walked slowly toward him when they arrived at the dealership and did not aggressively search his person or otherwise act aggressively toward him, they could not have believed that their "safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). But neither *Terry*, nor any other case in this circuit, mandates that officers act aggressively or quickly in order to justify performing a protective pat-down for weapons. Such a mandate would be dangerous precedent as it could encourage violations of the Fourth Amendment rights of individuals subject to *Terry*-style frisks and/or stops.

No. 17-30198

## IV.   Conclusion

For the reasons provided herein, the district court's rulings denying Williams's motions to suppress and Williams's conviction and sentence are affirmed.