**REVISED MARCH 4, 2015**
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70033

United States Court of Appeals
Fifth Circuit

**FILED**

February 13, 2015

Lyle W. Cayce
Clerk

THOMAS EDWIN LODEN, JR.,

   Petitioner - Appellants

v.

RICK MCCARTY, INTERIM COMMISSIONER, MISSISSIPPI
DEPARTMENT OF CORRECTIONS,

   Respondent - Appellee

Appeals from the United States District Court for the
Northern District of Mississippi

Before KING, DAVIS, and ELROD, Circuit Judges.

KING, Circuit Judge:

   Petitioner-Appellant Thomas Edwin Loden raped and murdered Leesa Marie Gray in 2000. After pleading guilty, Loden was sentenced to death by a Mississippi state court. Loden now appeals the district court's denial of his petition for a writ of habeas corpus. That petition was premised on the denial of Loden's constitutional right to the effective assistance of counsel during the guilt and sentencing phases of his trial. For the reasons that follow, we AFFIRM the judgment of the district court.

No. 13-70033

**I.**

Thomas Loden worked as a recruiter for the United States Marine Corps in Vicksburg, Mississippi, where he lived with his wife and daughter. He had travelled to Itawamba County, Mississippi, on June 21, 2000 to visit his ailing grandmother, Rena Loden, at her farm. On June 22, Loden claims he spoke to his wife on the phone, and she told him that she had just had "phone sex" with a partner at the law firm at which she worked as a paralegal and that she planned on having sexual intercourse with that partner while Loden was away.

Shortly thereafter, at around 9:00 p.m., Loden went into Comer's Restaurant, where Leesa Marie Gray, the victim, worked as a waitress. He had been in the restaurant earlier that day, and, according to witnesses, he had attempted to flirt with Gray. Loden ordered a cheeseburger to go and then left the restaurant. After Gray left work, at around 10:30 p.m., her car tire went flat on her drive home. Loden claims he saw her car by the side of the road and stopped. Loden then told Gray that he was in the Marine Corps and asked if she would ever be interested in enlisting. He claims that she replied "[n]o, that would be the last thing I'd want to do with my life." Loden states that her response enraged him, and he then kidnapped her in his van. He then raped her repeatedly and strangled her to death. Loden used a camcorder to record a substantial portion of his crime. The video shows Loden forcing Gray to perform fellatio on him, vaginally raping her, digitally penetrating her vagina and anus, and raping her repeatedly with an object, specifically a cucumber. At one point, Loden instructs Gray to smile so that he can see her braces. At another point, after he digitally penetrates her vagina, he states: "You really were a virgin, weren't you?" The video stops, and, when it restarts, Loden is seen twisting the breast of Gray, at that point unconscious, apparently attempting to return her to consciousness. After another break in

2

the video, Gray's dead body is seen posed in the van with the cucumber forced into her vagina. Loden removes and reinserts the cucumber several times before the videotape stops. After Loden had murdered Gray, he went into his grandmother's house and fell asleep.

When Gray did not return home from work that night, the police began investigating her disappearance. Witnesses reported that Loden had arrived at the restaurant in a van shortly before closing and ordered food. They also reported that he had been flirting with Gray earlier in the day. The police went to Loden's grandmother's farm to speak with him, and one of his grandmother's helpers informed them that Loden was asleep in the house. The officers left and returned later. When they returned, they spoke with Loden's grandmother, who informed them that Loden had left to go fishing at a nearby lake. The officers went to look for Loden, but could not find him. When they got back to the house, Ms. Loden gave her consent for the officers to search her property. The officers discovered a pair of shorts with blood on them in Loden's room and a rope tied into a handcuff-style knot in Ms. Loden's car. They then obtained a search warrant for the property and Loden's van. When the crime lab processed the van, they found Gray's body and, among other evidence, the camcorder with the video Loden made of his crime.

That same day, Loden was found lying by the side of a road in Itawamba County, Mississippi. His wrists were slashed and the words "I'm sorry" were carved into his chest. After he was released from the hospital, he was arrested. The police discovered a fresh grave, along with a shovel, in an out-of-the-way, heavily vegetated area on Loden's grandmother's property. Loden's wife visited him in jail and, after speaking with her, he confessed to raping Gray and to murdering her, though he stated that he did not remember killing her.

No. 13-70033

Loden was indicted for capital murder, rape, and sexual battery in Mississippi state court. James Johnstone, a private attorney, was appointed to represent Loden. Johnstone asked David Daniels, another attorney, to associate as his co-counsel in Loden's case.

Johnstone and Daniels filed several motions in Loden's case, two of which are relevant for purposes of this appeal. First, they filed a motion to suppress evidence obtained during the search of Loden's grandmother's property, including the vehicles on it, and Loden's confession as obtained in violation of the Fourth and Fifth Amendments, respectively. Second, they moved the court to provide funds so that they could hire an expert in the field of mitigation investigation. The trial court denied both motions, though, as to the second motion, the court told Loden's attorneys, "I'll give you an opportunity to tell me if you can locate any authority for this other than the fact that [the expert has] done it in the past. I would like to know what the courts of this country have said about this before I authorize this expenditure." Johnstone told the court: "We'll look and provide that for you, Your Honor." Neither Johnstone nor Daniels ever furnished any such supplemental authority to the court.

After the motion for funds was denied, Johnstone did not conduct any mitigation investigation during his representation of Loden. Daniels claims that he conducted a mitigation investigation by asking about mitigating issues when he interviewed witnesses, but the witnesses to whom he claims to have spoken contradict his claims. Further, Loden argues that neither of his attorneys spoke to the attorney with whom his wife was having an affair, who could have verified Loden's claim that his wife was taunting him about her infidelity on the night of the murder. Loden also argues that his attorneys

4

No. 13-70033

failed to interview Loden's military colleagues and to request his military records.

Further, Loden claims that his attorneys provided him with erroneous advice about his appellate rights after a guilty plea. Loden claims that his attorneys told him that if he pleaded guilty and received the death penalty, "the pre-trial motions would be reviewed by the Supreme Court of Mississippi under a heightened scrutiny review which applies to all death sentences." He claims that they assured him "that the rulings on the suppression motions were reviewable by the Supreme Court even if I pled [sic] guilty." A letter Loden sent to Daniels after he pleaded guilty appears to lend credence to Loden's claim that he misunderstood his appellate rights. Johnstone's recollection of his advice is somewhat different. He states in his affidavit:

> I told Loden that if he pleaded guilty and was sentenced to death, the Mississippi Supreme Court would review his sentence, and that they would review everything that was in the record. I told Loden that I believed that (1) the rulings on the suppression motions, (2) the order denying the request for funds to hire a mitigation specialist, and (3) the use of Loden's wife Kat to induce Loden to talk with the police on June 30, 2000 were issues that might be reviewed that were potentially viable.

Daniels's recollection differs. In Daniels's affidavit, he states:

> Mr. Loden asked me whether if he pleaded guilty to Capital Murder he could appeal his case. I told him there would be no direct appeal by us, but that the Mississippi Supreme Court would automatically review a sentence of death. I told him that we could not guarantee him exactly what the Court might do, or not do upon such review. I told Mr. Loden if he wanted to directly appeal and assign particular grounds for reversal of his conviction, that would be best served by going to trial.

In his deposition, Daniels further states that he explained to Loden that the Mississippi Supreme Court's automatic review of the sentence of death meant the court would review "[t]he Judge's finding, the Judge's sentence,

5

whether or not evidence supported the sentence, whether or not there was a proper finding regarding the aggravators and mitigators, whether or not he killed, attempted to kill, whether legal force had been contemplated and those types of things." Daniels states that Loden understood that by pleading guilty, he was waiving his right to appeal the adverse rulings on the suppression motions and that the automatic review may not cover those issues.

Loden pleaded guilty to all counts in the indictment. At a hearing, prior to accepting his guilty plea, the trial court advised him:

> Q. . . . Do you understand that as to each of the charges, Counts I through VI, if you proceeded to trial before a jury and if the jury found you guilty of those charges and returned a verdict fixing the penalty at whatever they might fix it, in any event, the question of your guilt or innocence or imposition of the punishment determined by the jury would be something that you could appeal to the Supreme Court of this state?
>
> A. Yes, sir, I understand.
>
> . . .
>
> Q. Do you understand that if you proceed through the course of this and the Court makes a determination of your guilt, you will have no right to appeal that? . . .
>
> A. Yes, sir.

At that same hearing, Loden was sentenced. During the sentencing portion of the hearing, Loden's counsel told the court that "Mr. Loden has elected to and has instructed us that he desires to waive presentation of this mitigation evidence for reasons I feel he will explain to the Court when given an opportunity to make a statement." Loden had also instructed Daniels and Johnstone not to object to any of the State's evidence, not to cross-examine any of the State's witnesses, and not to make any closing argument at the

6

sentencing hearing.    Nevertheless, counsel summarized the mitigation evidence they would have presented had Loden not so instructed them:

> Your Honor, through our investigation and our clinical psychologist's expert [sic] that's been appointed by the Court we've been able to develop that Mr. Loden has a childhood history of extreme sexual child abuse himself; that in spite of that he was an exemplary student, that he entered the [M]arine [C]orps, that he served in the United States Marines with distinction for eighteen years, that he attained the rank of E-7, that he was highly decorated and a combat veteran of Desert Storm.  He has no criminal record prior to today.
>
> The expert clinical psychologist that was appointed for the defense by the Court, Dr. Gerald O'Brien, would have been offered as an expert in the field of clinical psychology.  Dr. O'Brien opines that at the time of the crimes Mr. Loden was not capable of appreciating the criminality of his conduct and that he was also incapable of conforming his conduct to the requirements of the law. And finally that at the time of the crimes he was suffering from extreme mental and emotional disturbance.

Loden then made a statement at the hearing—though in place of his attorneys' closing arguments, not as testimony—expressing remorse for his actions to Gray's family, stating that he had tried to keep the proceedings as short and painless as possible for everyone, and that he hoped Gray's family would have some sense of justice when they left the court.

The trial court sentenced Loden to death.

Shortly after Loden was sentenced to death, Daniels accepted a position with the local district attorney's office, and the Mississippi Office of Capital Defense was appointed to represent Loden on appeal.[1]  Loden then brought a motion to vacate his guilty plea in the state trial court.  The trial court held a

---

[1] During Loden's post-conviction proceedings, which Daniels knew were ongoing, Daniels destroyed his files from Loden's case, an act which the Mississippi Supreme Court described as an exercise of "poor judgment." *Loden v. State*, 43 So. 3d 365, 400 (Miss. 2010).

No. 13-70033

hearing on the motion, and Loden testified that, based on the advice of his trial counsel, he erroneously believed that if he pleaded guilty, the Mississippi Supreme Court would automatically review the trial court's denial of his suppression motions. The trial court denied Loden's motion to vacate the guilty plea. The denial of his post-conviction motion to vacate the guilty plea was consolidated with his direct appeal, and the Mississippi Supreme Court affirmed the trial court on all grounds. *Loden v. State*, 971 So. 2d 548, 575 (Miss. 2007).

Loden then filed a second petition for post-conviction relief asserting the arguments addressed herein, among others that are not a part of this appeal.

As part of the habeas petition, Loden has come forward with what he characterizes as substantial additional mitigating evidence, summarized as follows. Loden's father was physically and sexually abusive towards Loden's mother, and, given that the family shared a single bedroom, Loden likely witnessed this abuse. Loden's mother would leave him and his sister alone in the house for days at a time. After his parents divorced, Loden went to live with his father, where Loden's step-mother abused him physically. Further, he was molested on several occasions by an adult male at a vacation Bible school that he attended. When Loden moved back to his mother's custody, his step-father drank heavily and beat him repeatedly. He also beat Loden's mother in front of Loden. Loden has attempted suicide several times, and his sister has attempted suicide as well.

After further shuffling back and forth between his parents, Loden went to live with his grandparents on their family farm. Loden was close to his grandparents, and Loden has proffered several affidavits from friends of Loden's in high school attesting to his good character. Loden did well academically in high school.

8

No. 13-70033

Loden was highly regarded in the Marine Corps. Loden was selected as an "outstanding recruit" from his platoon. He also received laudatory performance reviews and was promoted to the rank of Gunnery Sergeant. He was awarded, *inter alia*, the Navy Achievement Medal three times, the Good Conduct Medal five times, and a Combat Action Ribbon. Loden was deployed to Iraq during the Gulf War. During his deployment, he saw a friend, who had just gotten married and had a baby, killed by "friendly" fire. After he returned from the war, Loden drank heavily and took drugs. Loden suffered from psychological troubles, including nightmares, as a result of the war.

Loden has a daughter with his third wife, and he frequently acted as the primary caregiver to his daughter. Loden was transferred to a job as a military recruiter and presents testimony that it is a difficult and stressful post due to the recruiting quotas.

Additionally, a psychologist employed by habeas counsel has diagnosed Loden with chronic Post-traumatic Stress Disorder due to his combat experience, complex Post-traumatic Stress Disorder due to abuse in his childhood, and Borderline Personality Disorder. Further, the psychologist diagnosed Loden as having suffered a localized episode of dissociative amnesia during the commission of the crime. Additionally, the defense psychologist originally retained by Loden's trial counsel, Dr. O'Brien, has stated in an affidavit that, had he been privy to the information relied on by Loden's habeas psychologist, he would have reached the same conclusions and diagnoses as the habeas psychologist.

The Mississippi Supreme Court denied Loden's second petition for post-conviction relief for reasons that will be discussed below. *Loden v. State*, 43 So.3d 365, 401 (Miss. 2010). Loden then filed the instant petition for a writ of habeas corpus in the United States District Court for the Northern District of

9

No. 13-70033

Mississippi. The District Court denied Loden's petition, but granted a certificate of appealability on five issues: (1) trial counsel's failure to develop mitigation evidence; (2) the "effect" of Loden's "guilty plea and waiver of jury sentencing;" (3) "defense counsel's litigation of the case;" (4) the cumulative effect of trial counsel's performance; and (5) the performance of appellate counsel.[2] Loden then timely appealed to this court.

## II.

Federal habeas corpus review of state court decisions is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254. Under AEDPA, a federal court cannot issue a writ of habeas corpus with respect to a claim adjudicated on the merits by a state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Because of this highly deferential standard of review, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Under AEDPA, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, --- U.S. ---, ---, 131 S. Ct. 770, 786 (2011).

When, as here, a habeas petitioner's claim has been adjudicated on the merits in state court, "review under § 2254(d)(1) is limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---, ---, 131 S. Ct. 1388,

---

[2] Loden's brief does not address issue (4) or treat issue (3) separately; as such, we do not address them.

1398 (2011). Where section 2254(d) does not apply, section 2254(e) constrains the discretion of district courts to grant evidentiary hearings. *See id.* at 1400–01. A district court's decision not to hold an evidentiary hearing is reviewed for abuse of discretion. *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (citing *Landrigan*, 550 U.S. at 468).

## III.

Loden first argues that he was deprived of his constitutional right to the effective assistance of counsel because his trial counsel failed to accurately advise him of the scope of his appellate rights. According to Loden, his trial counsel inaccurately informed him that, if he pleaded guilty, the trial court's adverse rulings on his suppression motions would still be examined during the Mississippi Supreme Court's automatic review of his case. That is not the case, and, as such, the Mississippi Supreme Court did not address Loden's suppression motions on direct appeal.

The Sixth Amendment right of criminal defendants to the assistance of counsel includes the right to the effective assistance of counsel. *Carty v. Thaler*, 583 F.3d 244, 257 (5th Cir. 2009). An ineffective assistance of counsel claim has two components: (1) the defendant must show that his attorney's performance was deficient; and (2) he must show that he was prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To show deficient performance, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Reed v. Stephens*, 739 F.3d 753, 773 (5th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688). Counsel's performance is judged based on prevailing norms of practice, and judicial scrutiny of counsel's performance must be highly deferential to avoid "the distorting effects of hindsight." *Carty*, 583 F.3d at 258. To show prejudice, the defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Sixth Amendment right to the effective assistance of counsel applies at "critical stages of the criminal proceedings." *Missouri v. Frye*, --- U.S. ---, ---, 132 S. Ct. 1399, 1405 (2012) (internal quotation marks omitted). The decision to plead guilty is a critical stage of criminal proceedings. *Id.* "In cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* at 1409 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

We do not address the first *Strickland* element, as we conclude that the district court did not err in holding that Loden failed to meet his AEDPA burden as to *Strickland* prejudice. As an initial matter, the Mississippi Supreme Court expressly did not rule on the prejudice element of the *Strickland* test. *See Loden*, 971 So. 2d at 574. As such, the Mississippi Supreme Court's decision is not entitled to AEDPA deference as to that element. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo* and agree with the dissent in the Court of Appeals." (citations omitted)). However, the state trial court ruled on Loden's ineffective assistance of counsel claims and did not expressly cabin its decision to either element. Where a lower state court ruled on an element that a higher state court did not, the lower state court's decision is entitled to AEDPA deference. *See Atkins v. Zenk*, 667 F.3d

939, 944 (7th Cir. 2012) ("Because both prongs have been addressed by Indiana state courts, in one form or another, the deferential standard of review set out in § 2254(d) applies to both."); *Hammond v. Hall*, 586 F.3d 1289, 1332 (11th Cir. 2009) ("[W]here a state trial court rejects a claim on one prong of the ineffective assistance of counsel test and the state supreme court, without disapproving that holding, affirms on the other prong, both of those state court decisions are due AEDPA deference."). Further, if a state court (here, the state trial court) does not state the grounds on which it denied an ineffective assistance claim, federal habeas courts will consider it to have adjudicated both grounds. *See Richter*, --- U.S. at ---, 131 S. Ct. at 784. As such, here the state trial court's decision as to the prejudice element is entitled to AEDPA deference.

Assuming *arguendo* that Loden's attorneys' performance was deficient, he has failed to show that the state court's decision that he was not prejudiced by that performance is an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Loden testified during the habeas proceedings in the state trial court. He testified regarding his interpretation of his attorney's advice and stated that he would not have pleaded guilty but for that erroneous advice. Yet Loden's assertion that he would not have pleaded guilty had he known review of the suppression motions would be unavailable is contradicted by his statement to Gray's family at his sentencing hearing. At the sentencing hearing, Loden apologized to Gray's family and stated, "I hope that by my actions here today you may see that I am trying to right a wrong," and "I am sorry for the delay, and I hope that you may have some sense of justice when you leave here today." Loden also stated that he had "tried to keep this as short and as painless as possible for everyone."

No. 13-70033

Loden's statements indicate that he pleaded guilty as an offering of contrition to Gray's family and an attempt to spare them a lengthy trial and grant them some measure of closure. Loden's statements were also consistent with his earlier representations, made shortly after he had murdered Gray, to the district attorney that he wanted to plead guilty in order to allow his family and Gray's family to move forward, statements which were the subject of cross-examination during Loden's post-conviction hearing. In contrast, Loden testified during the post-conviction hearing that he only pleaded guilty in order to obtain a more searching review of the denial of his suppression motions by the Mississippi Supreme Court, a review he believed was available based on the (allegedly) erroneous advice of his attorneys.[3] Those suppression motions were directed at the most damning evidence in the State's possession—the video recording of Loden's crime and Loden's confession. As such, Loden's statement that he pleaded guilty only out of a desire for appellate review of his sentence is in sharp tension with his statement at the time of his plea and sentencing. That contradiction was drawn out during cross-examination by the State during Loden's post-conviction hearing:

> Q. Correct. Now more than a year later you were under whatever influence that night, you pled [sic] guilty. During that plea you went into this routine where you spoke to the Court. Do you recall that?
>
> A. Yes. I can't remember what I said, but I know I said a few words.
>
> Q. And you explained to the family, to the Court and the family of the victim that, you know, you knew nothing could offer solace or come close to expressing your most sincere regrets over

---

[3] Loden testified as follows:

> Q. When you pled [sic] guilty, did you want to be executed?
>
> A. No. I wanted the death penalty. I wanted the - - I wanted the death penalty for the closer review and for their hopefully maybe getting some better rulings than what I had originally.

this whole affair, wish there was something you could say more. *I hope that by my actions here today you may see that I am trying to right a wrong.*

But what you're now telling the Court is you were pleading guilty but you didn't really mean it. You wanted this whole thing overturned so you could go back to Vicksburg and do whatever. Were you trying to right a wrong?

A. What I would like to say to that is that is, I don't know how to explain this to you in a proper way, is that no matter what - - do I have remorse and everything? Yes. But I'm still entitled to the rights that I'm supposed to have. And at that time I had been told that anything that was in the record is going to get looked at, and then subsequently I find out that's not the case.

. . .

Q. All right. Let's go back to what we're talking about. You then go on to tell the family, *I am sorry for the delay and I hope you may have some sense of justice when you leave here today.* Once again, at that time you're telling me that you thought at the time you're saying you're trying to right a wrong and you hope to have some sense of justice that you're in the back of your head thinking, *Yeah, I got the death penalty. I get to appeal all this and eventually walk out of here when my rights are asserted.* That's what you're really thinking when you're saying this stuff?

In summation at the post-conviction hearing, the State pressed the issue, arguing: "What has happened here is at some point Mr. Loden actually felt guilty and tried to do the right thing and pled [sic] guilty, and he's gotten down here and he doesn't much like it." Moreover, the state court habeas judge was also the judge who had presided over Loden's guilty plea and sentencing and who therefore had heard Loden's statement to Gray's family firsthand. Given that the trial court heard Loden's testimony and was able to assess his credibility, the trial court's finding that Loden was not prejudiced by counsel's deficient performance was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The state

15

trial court was free to conclude, based on Loden's testimony, that Loden understood his appellate rights at the time of trial or that the other considerations that prompted Loden to plead guilty would nevertheless have motivated him to maintain a guilty plea even had he known he would be unable to appeal the trial court's rulings on his suppression motions.

Further, the state habeas judge was the same judge who advised Loden of his appellate rights during his plea colloquy, which included an admonition that Loden would have no right to appeal a finding of guilt. Loden discounts that admonition here, arguing that a warning that he was waiving his right to appeal was perfectly consistent with his attorneys' erroneous advice that the Mississippi Supreme Court's *automatic review* would encompass his suppression motions. As such, he argues that he had no reason to question the trial judge further about his appellate rights or to be concerned that his right to review of the suppression motions was more limited than his attorneys had led him to believe. Yet the trial court was not unreasonable in rejecting that interpretation of the facts, as lending it credulity requires embracing several contradictions. First, Loden's argument rests on the notion that he was an uninformed novice when it came to understanding the legal system, incapable of understanding the difference between review of a sentence and review of guilt, but that, at the same time, he possessed sufficient erudition to comprehend the (very) fine distinction between an *appeal* of a death sentence to the Mississippi Supreme Court and the Mississippi Supreme Court's *automatic review* of a death sentence without feeling the need to question the trial judge further. Second, Loden asserts that, with regard to the second issue in this appeal, discussed *infra*, that he was virtually abandoned by his attorneys and was so despondent because of their grossly negligent performance that he gave up hope and waived his right to present any

mitigation evidence at sentencing.  Yet at the same time, Loden argues that he posed no questions to the trial judge regarding his appellate rights because he was perfectly confident in *those same attorneys'* advice.  Given Loden's repeated assertions that the right to appeal the suppression motions was crucially important to him, as he argues that he believed it was his only hope of avoiding the death penalty, it is difficult to believe that Loden would not have asked the trial judge for further clarification of his appellate rights after a guilty plea, especially if he had truly lost confidence in his attorneys.

Based on the Mississippi state court's ability to observe Loden's testimony firsthand and these contradictions in Loden's arguments, we cannot say that the Mississippi state court's finding that Loden was not prejudiced by his attorney's (purportedly) deficient performance was unreasonable.  As such, the Mississippi courts' decision that Loden is not entitled to habeas relief on the basis of his attorneys' advice regarding his appellate rights was not an unreasonable application of clearly established federal law as interpreted by the Supreme Court of the United States or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## IV.

### A.

Loden's second argument is that his right to the effective assistance of counsel was violated by his attorneys' failure to prepare a mitigation case. Defense attorneys in capital cases have an "'obligation to conduct a thorough investigation of the defendant's background.'"  *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  Such an investigation requires that defense counsel interview witnesses and request relevant records, such as school, medical, or military service records.  *Id.* Further, when such interviews or records suggest "pertinent avenues for

investigation," the defense attorney must follow up on those leads. *Id.* at 440; *accord Wiggins v. Smith*, 539 U.S. 510, 525 (2003) ("As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background."). As with all claims for ineffective assistance of counsel, relief based on an insufficient mitigation investigation requires a showing of both deficient performance and prejudice. *See Porter*, 558 U.S. at 38.

We begin with the prejudice element first, as, in this case, it is dispositive. Loden's argument that he was prejudiced by his attorneys' mitigation investigation[4] is complicated by his instruction to his attorneys not to present mitigation evidence during the sentencing phase of his trial. *See Schriro v. Landrigan*, 550 U.S. 465 (2007). In *Landrigan*, the defendant was convicted of capital murder. 550 U.S. at 469. When his attorneys attempted to put on testimony in mitigation at sentencing, the witnesses refused to testify at the defendant's instruction. *Id.* Defense counsel told the court that he had advised the defendant against declining to put on a mitigation case. *Id.* The court then questioned the defendant, who told the court that he did not wish for his attorneys to put on a mitigation case and that there were no mitigating circumstances of which the court should be made aware. *Id.* When his attorneys attempted to summarize the mitigation evidence they had intended to put on, Landrigan interrupted and contradicted their explanations of his past actions. *Id.* at 470. The trial judge sentenced Landrigan to death. *Id.* at 471. Landrigan then challenged his death sentence via a habeas petition,

---

[4] Which we assume *arguendo* was deficient.

challenging his attorney's failure to conduct a proper mitigation investigation as ineffective assistance of counsel. *Id.* The Supreme Court held that Landrigan's refusal to allow his attorney to present mitigation evidence precluded his ability to show *Strickland* prejudice. *Id.* at 481. Relying on Landrigan's repeated statements to the court and his attorney that he did not want mitigating evidence presented, the Court held that the state post-conviction court was not unreasonable in determining that Landrigan instructed his attorney not to bring any mitigating evidence to the trial court's attention. *Id.* at 477. As such, the Court held that the district court did not abuse its discretion in denying Landrigan an evidentiary hearing on habeas review. *Id.* The Court stated that "[t]he District Court was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence," and therefore, "the District Court could conclude that because of his established recalcitrance, Landrigan could not demonstrate prejudice under *Strickland* even if granted an evidentiary hearing." *Id.* Additionally, the Supreme Court rejected the Ninth Circuit's reliance on an absence of evidence that Landrigan's decision not to present mitigating evidence was informed and knowing, stating that "[w]e have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Id.* at 479.

At this point, the AEDPA standard of review bears reiterating. We may only set aside the Mississippi Supreme Court's judgment if it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Given that statutory mandate, we do not here decide whether Loden is able to demonstrate *Strickland* prejudice in spite of his instruction to his attorneys

not to put on mitigation evidence. Rather, we decide only whether the Mississippi Supreme Court's judgment that he could not so demonstrate prejudice was unreasonable in light of clearly established Supreme Court precedent.

Loden here instructed his attorneys not to present any mitigation evidence. Daniels, one of his attorneys, told the court at the sentencing hearing that Loden had "elected to and has instructed us that he desires to waive presentation of this mitigation evidence for reasons I feel he will explain to the Court when given an opportunity to make a statement." Loden had also instructed his attorneys not to conduct any cross-examination of the State's witnesses and not to object to any of the State's evidence, an instruction that his attorneys honored. The trial court specifically inquired as to Loden's instruction not to cross-examine witnesses or object to evidence:

> MR. JOHNSTONE: Your Honor, if we could at this time advise the Court. We have conferred with our client Mr. Loden, and as the Court noted earlier we were not making any objections nor cross-examining these witnesses. And we've conferred with Mr. Loden and he's advised us that he does not want us to cross-examine witnesses or object to the introduction of any exhibits that are being introduced through these witnesses that the State intends to call.

> THE COURT: All right. Mr. Loden, you understand that in instructing your attorneys to that effect you are giving up a valuable right of cross-examination and timely objections to evidence which might or might not be admissible under the rules of this court.

> THE DEFENDANT: I understand, sir. I'm just doing what I feel I need to do.

Loden further instructed his attorneys not to make any closing argument during the sentencing phase, instead electing to make a brief statement himself apologizing to Gray's family and stating, "I hope that by my actions

here today you may see that I am trying to right a wrong," and "I am sorry for the delay, and I hope that you may have some sense of justice when you leave here today."[5] Loden also stated that he had "tried to keep this as short and as painless as possible for everyone."

With those facts before it, we cannot say that the Mississippi Supreme Court's application of *Landrigan* in this case was an unreasonable application of clearly established Supreme Court precedent. Loden's instruction to his attorneys to not only refrain from putting on any mitigation case, but also to refrain from objecting to the State's proffered evidence, cross-examining the State's witnesses, and making closing arguments lends support to an inference that Loden's decision not to present a mitigation case was firm. Daniels's statement to the trial court further indicates that Loden's decision was a considered one and that he had explained his reasoning to his attorneys. While the trial court did not inquire as to Loden's reasons for declining to present a mitigation case, Loden's statement alludes to a likely motivation. Loden's words of apology suggest that he believed declining to object, cross-examine, or present evidence served as a measure of penance for his crime. Daniels also commented in his deposition that "Loden did not want to acknowledge what he had done, and he didn't want to acknowledge it to me. He didn't want a jury to hear it. He didn't want anybody that didn't have to know about it to know about it." Daniels's observations provide additional insight into the motivations behind Loden's instruction to abbreviate the sentencing proceedings. Moreover, the type of mitigation evidence described by Daniels, and interdicted by Loden, at the sentencing hearing—evidence of childhood physical and sexual abuse, academic achievement, distinguished military

---

[5] Loden's statement was made in lieu of his attorney's closing arguments and was not offered as testimony in mitigation.

service, and psychological troubles—is at the very least of the same type as the evidence Loden now offers, further indicating that the Mississippi Supreme Court's application of *Landrigan* was not unreasonable.  Additionally, while Loden's instructions to his attorneys here may not have been as strident, public, or obstructive as those in *Landrigan*, the record here evidences something more resolute than a mere instruction not to present mitigation evidence.  *Landrigan* states only that the defendant's actions in that case were *sufficient* to preclude a showing of prejudice; it does not speak to what actions are *necessary* to bar such a showing.  *See Landrigan*, 550 U.S. at 475–77.  Therefore, the Mississippi Supreme Court's conclusion that, under *Landrigan*, Loden's decision not to present mitigation evidence precludes a showing of *Strickland* prejudice was not an unreasonable application of clearly established Supreme Court precedent to the facts of this case.

As such, given the evidence in the record—and the AEDPA standard of review—we must conclude that the district court's denial of Loden's claim of ineffective assistance of counsel based on his attorney's mitigation investigation was not error.

**B.**

We also hold that the Mississippi Supreme Court's rejection of Loden's argument that the constitutionally ineffective advice of his attorneys led him to waive his right to jury sentencing was not an unreasonable application of clearly established Federal law as determined by the Supreme Court.  During the plea colloquy, the trial judge explained to Loden that he had the right to be sentenced by a jury, that the jury would weigh the aggravating factors against the mitigating factors, and that, in order to receive the death penalty, the jury would have to unanimously agree that the aggravating factors outweighed the mitigating factors.  The judge then asked Loden if he

No. 13-70033

understood those rights and waived them.  The trial judge's careful explanation of Loden's right to jury sentencing on the record undermines Loden's present attempts to show *Strickland* prejudice.  *See Frye*, --- U.S. at ---, 132 S. Ct. at 1406–07 ("Before a guilty plea is entered the defendant's understanding of the plea and its consequences can be established on the record. This affords the State substantial protection against later claims that the plea was the result of inadequate advice.").  As such, the Mississippi Supreme Court's decision that Loden could not show that—but for any unprofessional advice by his attorneys—he would not have waived jury sentencing was not an unreasonable application of clearly established Federal law as determined by the Supreme Court.[6]

## V.

Lastly, Loden argues that his appellate counsel was constitutionally deficient.  A criminal defendant has a Sixth Amendment right to the effective assistance of counsel on direct appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  Claims for ineffective assistance of appellate counsel are governed by the two-part *Strickland* standard.  *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013).

Beginning with the first part of that standard, Loden has failed to show that his appellate attorneys' performance was deficient.  As an initial matter,

---

[6]Loden also appears to argue that his attorneys' performance was deficient due to their failure to explain to him the circumstances of the *Byrom* case, another death penalty case tried before Judge Gardner.  Loden points us to no Supreme Court precedent holding that an attorney's failure to explain a trial judge's performance in specific prior cases constitutes ineffective assistance of counsel.  Loden also fails to point to any resources relating to the professional responsibility of criminal defense attorneys indicating that a failure to explain the results and circumstances of specific prior cases before the trial judge is unprofessional.  *See Strickland*, 466 U.S. at 688 (suggesting that "[p]revailing norms of practice as reflected in American Bar Association standards and the like" could be used to aid the inquiry into attorney performance).

23

the Mississippi Supreme Court did not address this element of the *Strickland* standard, and, as such, this claim is reviewed *de novo*, not under AEDPA. *See Rompilla*, 545 U.S. at 390. In order to show that his appellate lawyers were deficient, Loden must show "'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment' based on 'an objective standard of reasonableness.'" *Dorsey*, 720 F.3d at 320 (quoting *Strickland*, 466 U.S. at 687–88). Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Pinholster*, --- U.S. at ---, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690). Here, Loden's proffered evidence of deficient performance is an affidavit from his appellate attorney, Andre de Gruy. De Gruy states in his affidavit that he did not raise certain issues relating to Loden's mental state or social history. He also states, however, that Mississippi law was unclear at the time he represented Mr. Loden, and, therefore, he believed that the additional claims would have to be raised in post-conviction proceedings challenging the sentence. Given the apparent ambiguity in Mississippi law at the time counsel made his decision, Loden has failed to rebut the "strong presumption" that his attorneys' decision was the result of "reasonable professional judgment." *Strickland*, 466 U.S. at 689–90.

As to the second part of the *Strickland* standard, Loden has failed to show that the Mississippi Supreme Court's conclusion that he was not prejudiced was an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. In order to show prejudice under *Strickland*, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Here, that requires Loden to show a reasonable

probability that the result of his direct appeal would have been different. Loden has failed to make such a showing here, as he has waived the issue for failure to adequately brief it. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it."). Loden's argument here is that an adequate performance by appellate counsel would have changed the outcome of his Motion to Vacate Guilty Plea before the trial court, yet he does not articulate the standard for such motions under Mississippi law. *See id.* at 447 ("[A]mong other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards and any relevant Fifth Circuit cases." (internal quotation marks omitted)). Loden also points to the additional psychological evidence presented in Dr. High's affidavit and argues that appellate counsel was deficient for not developing that evidence themselves and presenting it before the trial court. Yet Loden fails to connect Dr. High's statements regarding Loden's mental state at the time he pleaded guilty to the mental state required by law for the entry of a valid plea or even to articulate what the required mental state is. *See id.* at 446–47. Loden also argues that his appellate attorneys' arguments that his trial lawyers' erroneous advice about his right to appeal the denial of his suppression motions were deficient. Yet that claim was presented by Loden's appellate lawyers in the motion to vacate the guilty plea. In resolving that motion, Loden testified and the trial court apparently found his assertion that he misunderstood his appellate rights and would not have pleaded guilty had he been properly advised not to be credible. It is unclear what Loden contends his appellate counsel should have done that would alter that result. As such, the Mississippi Supreme Court's decision that Loden was not prejudiced by any deficient performance

No. 13-70033

by his appellate counsel was not unreasonable under clearly established federal law, as determined by the United States Supreme Court.

**VI.**

For the foregoing reasons, the judgment of the district court is AFFIRMED.